A. E. and BRENDA L. BODDY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Boddy v. Commissioner
Docket No. 22710-80.
United States Tax Court
T.C. Memo 1984-156; 1984 Tax Ct. Memo LEXIS 514; 47 T.C.M. (CCH) 1381; T.C.M. (RIA) 84156; March 29, 1984. John M. Bovis and William E. Frantz, for the petitioners. David D. Aughtry, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Taxable Year
Deficiency
1976
$13,307
1977
23,044
The sole issue for decision is whether petitioners' Arabian horse-breeding operation was an "activity * * * not engaged in for profit" within the meaning of section 183(a). [1]
FINDINGS OF FACT Some of the facts have been stipulated *516 and are found accordingly. Petitioners, Dr. A. E. @boddy and Brenda L. Boddy, husband and wife, resided in Woodstock, Georgia, at the time they filed their petition herein.Dr. A. E. Boddy (hereinafter petitioner) filed joint Federal income tax returns (Form 1040) with his former wife, Frances Boddy, for the taxable years 1963 through 1974. Petitioners, A. E. Boddy and Brenda L. Boddy, filed joint Federal income tax returns (Form 1040) for the taxable years 1975 through 1980; petitioners filed tax returns for the years in issue, 1976 and 1977, with the Internal Revenue Service Center at Chamblee, Georgia. Prior to 1961, petitioner had limited experience with raising horses; as a child, he worked as an exercise boy and, sometime during the early 1950's, petitioner owned an unregistered pleasure horse. In June 1961, petitioner graduated from medical school and after a one-year residence he established a medical clinic in Woodstock, Georgia. The clinic was a profitable venture, employing four other physicians and an optometrist. At all relevant times, petitioner had a full-time medical practice at this clinic.
In addition to the clinic, petitioner is involved with several other *517 profitable businesses. Petitioner is the sole shareholder and president of Woodstock Health Services, Inc., which does business as Cherokee Atomedic Hospital. He is also majority shareholder and president of Woodstock Apothecary, Inc., which does business as a pharmacy in Woodstock, Georgia. Finally, he owns a nursing center in Woodstock which is leased out to a chain of nursing homes. During the early 1960's, petitioner became interested in owning a horse-breeding farm. In this regard, he visited and inspected various horse-breeding farm operations in the region, but did not discuss the profitability of the farms with their owners.Petitioner also consulted with Mr. Samuel Cobb, an accountant and attorney, concerning horse-breeding and was advised by Mr. Cobb that it was difficult to make a profit in that business. In 1962 or 1963, petitioner purchased a number of unregistered mares and a Tennessee Walker stallion to begin breeding Tennessee Walkers. On May 16, 1963, petitioner purchased a 48-acre tract of land in Woodstock. Soon thereafter, he built a house with a swimming pool in the center of the 48-acre tract and a barn near the house. Petitioner, his family, and the *518 horses all moved out to the ranch which he named Long Lane Farms (hereinafter the farm). Throughout the years in issue, this was petitioner's only residence. Petitioner, also a collector of antique cars, built a metal structure next to the barn to house his antique cars and farm equipment. In September 1964, petitioner purchased an additional 14.8-acre tract of land running along the western side of his farm which was used primarily for pasture. During 1964, petitioner had a personal disagreement with the Tennessee Walking Horse Association over the cruelty involved in showing such horses which caused him to stop breeding Tennessee Waling horses. After consulting with several individuals, petitioner decided, instead, to breed Arabian horses. In 1965, petitioner purchased a registered Arabian stallion, and he began breeding this stallion with unregistered mares to produce half-breed offsprings. The half-bred foals were registered with the American Arabian Horse Association. During this period of time, petitioner joined several associations including the Georgia Arabian Horse Association and the Arabian Horse Registry of America. Memberships in these associations enabled petitioner *519 to register his horses at reduced rates, obtain literature, and receive group insurance rates for his breeding stock. In approximately 1968 or 1969, petitioner purchased a purebred mare and gradually began breeding purebred Arabians. During the mid-1970's, petitioner owned four breeding stallions and approximately 18 registered mares. His most prized stallion, Mr. Storm, was a national top 10 halter stallion, national top 10 western pleasure stallion, and winner of the legion of merit prize. In 1972 and 1973, a number of foals on petitioner's farm contracted a disease and died. In 1974, one colt was scarred by barbed wire fence. By 1975, petitioner's herd had grown to about 50 to 60 horses and has remained at that size throughout the years in issue. According to petitioner's personal financial statement completed in May 1975, the fair market value of the horses was $35,000. On the farm's balance sheet dated December 31, 1976, petitioner's breeding stock was valued at $35,740; on its December 31, 1977 balance sheet, petitioner's breeding stock was valued at $90,140. During 1975, petitioner was involved in a divorce proceeding with his first wife, Frances W. Boddy. Petitioner *520 had three children by his first marriage, all of whom enjoyed riding the horses at one time or another. Petitioner then married petitioner Brenda L. Boddy (hereinafter Brenda) in 1975. Brenda had one child by a prior marriage, Andy, and two children by Dr. Boddy -- Kevin and Robby. Brenda and Andy enjoyed riding the horses on occasion, however, Kevin and Robby were too young to ride.
During 1976 and 1977, petitioner began experiencing chest pains which were later diagnosed as angina. On November 21, 1977, petitioner had open heart surgery and a quadruple bypass was performed. Thereafter, petitioner's physical activity on the farm was substantially diminished. During the years in issue petitioner estimates that he and his family spent a total of 40 to 50 hours per week on the farm performing various chores including cleaning stables, grooming and showing horses, and training horses. Petitioner advertised his horses for sale in various trade publications. In general, petitioner operates his farm in a businesslike manner, he maintained two checking accounts in the name of Long Lane Farms at separate banks. Although petitioner drew checks for personal and business purposes from *521 these accounts, separate books and records were maintained for the horse-breeding operations through a coding system whereby personal expenses were coded as such an separated from business expenses.The books and records of the horse-breeding operation, maintained by petitioner's accountant, reflected only the income and expenses of the farm. Petitioner did not maintain any records which would indicate the number of horses owned at any one time, the date purchased, the date of birth, the sales date, or the sales price. The following chart indicates a summary of the revenue, expenses, and losses generated by petitioner's horse-breeding operation: [2]
Gain (Loss)
Total
[1] From [2]
Farm
Year
Horse Sales
Other
Income
1963
$ (90.00)
(90.00)
1964
(222.25)
$125.00
(97.25)
1965
154.00 100.00
254.00 1966
1,770.65 302.00
2,072.65 1967
3,310.00 3,310.00 1968
4,722.30 4,091.67
8,813.97 1969
2,100.00 3,376.14
5,476.14 1970
1,340.00 1,790.72
3,130.72 1971
625.00 1,410.00
2,035.00 1972
8,958.75 2,117.80
11,076.55 1973
2,040.62 2,849.28
4,889.90 1974
7,014.12 4,581.34
11,595.46 1975
750.00 302.00
1,052.00 1976 *
(549.00)
705.00
156.00 1977 *
1,250.00 1,278.00
2,528.00 1978
19,435.00 [3] 7,499.00
26,934.00 1979
9,125.00 2,860.00
11,985.00 1980
700.00 1,265.00
1,965.00 Total
$62,434.19 $34,652.95
$97,087.14 *522 Net Gain
Or
Year
Farm Expense
Depreciation
(Loss)
1963
$ 1,199.02
$ 977.55
$ (2,266.57)
1964
1,496.45
1,071.95
(2,665.65)
1965
4,767.05
1,812.21
(6,325.26)
1966
6,520.24
4,007.57
(8,455.16)
1967
7,811.65
4,151.08
(8,652.73)
1968
9,242.37
4,151.60
(4,580.00)
1969
6,747.70
5,483.98
(6,755.54)
1970
7,717.68
6,234.65
(10,821.61)
1971
12,526.90
7,549.25
(18,041.15)
1972
27,593.98
10,582.23
(27,099.66)
1973
37,166.78
16,157.17
(48,434.05)
1974
40,721.84
10,495.00
(39,621.38)
1975
25,675.00
8,439.00
(33,062.00)
1976 *
21,618.00
6,568.00
(28,030.00)
1977 *
32,279.00
13,488.00
(43,239.00)
1978
33,060.00
14,340.00
(20,466.00)
1979
29,728.00
15,958.00
(33,701.00)
1980
32,228.00
15,000.00
(45,263.00)
Total
$338,099.66
$146,467.24
($387,479.76)
*523 Despite consistent losses from 1963 until the time of trial, no projections of profit or loss of the horse-breeding operations were ever made. Nor did petitioner calculate a break-even point. During the years in issue, 1976 and 1977, petitioners were in the 62 percent tax bracket disregarding the loss deduction claimed relative to the horses. Petitioners earned $132,236 in 1976 and $162,801 in 1977 from practicing medicine as well as operating the medical clinic, hospital, apothecary, and the nursing home. Petitioners' after-tax cost of the horse-breeding activity did not constitute a significant portion of their gross income as demonstrated by the following table: Cost of Breeding Activity
1976
1977
Loss deduction
$28,030 $43,239 Depreciation
(6,568)
(13,488)
Out of pocket cost
21,462 29,751 Tax saving as calculated in the
Statutory Notice of Deficiency  13,307 23,044 Actual after tax cost
8,155 6,707 Cost as a percentage of gross income
6.2% 4.1% On their Federal income tax returns, petitioners deducted losses of $28,030 in 1976 and $43,239 in 1977, resulting from the operation of their Arabian horse-breeding *524 activities. In the notice of deficiency, respondent disallowed the losses because he concluded that the horse-breeding operation was an activity not engaged in for profit. OPINION The sole issue for decision is whether petitioners' horse-breeding operation was an "activity * * * not engaged in for profit" within the meaning of section 183(a). Section 183(a) provides in pertinent part that if an individual engages in an activity, and "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Section 183(b)(1) provides that only those deductions allowable regardless of a profit objective (such as interest or taxes) may be taken. Additionally, section 183(b)(2) provides that other deductions which would be allowable if the activity is engaged in for profit shall be allowed "but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1)." Section 183(c) defines an activity not engaged in for profit *525 as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." The test for determining whether expenses are attributable to either trade or business under section 162 or to the production of income under section 212 is whether the taxpayer's primary intention and motivation was to make a profit from the activity. Golanty v. Commissioner,72 T.C. 411, 425 (1979), affd. in unpublished opinion 647 F. 2d 170 (9th Cir. 1981); Lemmen v. Commissioner,77 T.C. 1326, 1340 (1981). The taxpayer must have entertained an actual and honest profit objective in connection with his activities. Dreicer v. Commissioner,78 T.C. 642 (1982), affd. in an unpublished opinion 702 F. 2d 1205 (D.C. Cir. 1983). The taxpayer's expectation of profit need not be a reasonable one, but there must be a good faith objective of making a profit. Section 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner,supra at 645. *526 The determination of whether the requisite profit objective exists is to be resolved on the basis of all the surrounding facts and circumstances of the case. Section 1.183-2(b), Income Tax Regs.; Golanty v. Commissioner,supra at 426.Greater weight is to be given to the objective facts than to the taxpayer's mere statement of his intent. Section 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner,supra at 645. Petitioner has the burden of proof to show he had the requisite intention and that the respondent's determination that the activities were not engaged in for profit is incorrect. Welch v. Helvering,290 U.S. 111 (1933); Golanty v. Commissioner,supra at 426; Rule 142(a), Tax Court Rules of Practice and Procedure.
Section 1.183-2(b), Income Tax Regs. *527 , provides a list of relevant factors to be considered in determining whether an activity is engaged in for profit. Such factors include: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Applying these factors to the record herein, we conclude that petitioners' Arabian horse-breeding operation was an "activity * * * not engaged in for profit" within the meaning of section 183(a). Although no one factor is conclusive, a record of substantial losses over many years and the unlikelihood of achieving a profitable operation are important *528 factors bearing on the taxpayer's true intention. Section 1.183-2(b)(6), Income Tax Regs.; Golanty v. Commissioner,supra at 426; Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F. 2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967). [3] In Bessenyey this Court stated at page 274: the presence of losses in the formative years of a business, particularly one involving the breeding of horses, is not inconsistent with an intention to achieve a later profitable level of operation, bearing in mind, however, that the goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years.
In Golanty v. Commissioner,supra, the taxpayer was similarly engaged in the activity of breeding Arabian horses. There the taxpayer experienced 7 years of losses totaling $129,552. In finding that the activity was not engaged in for profit, *529 this Court stated: when we strip away all the talk, dig out the hard facts, and apply cold logic to them, we are convinced that the petitioner did not truly expect to make a profit from her horse-breeding venture, and that such activity was not potentially profitable and could not "recoup the losses which have meanwhile been sustained in the intervening years." * * * A record of such large losses over so many years is persuasive evidence that the petitioner did not expect to make a profit. [Golanty v. Commissioner,supra at 427; Citations omitted.] Petitioner argues that the series of losses were attributable to "fortuitous circumstances beyond the control of the taxpayer * * *" and symptomatic of the early years of any breeding operation. We disagree. Petitioner began his horse-breeding operation in 1963 by purchasing a Tennessee Walking stallion and some mares. Within a year, petitioner, dissatisfied at the way Tennessee Walking horses were treated in shows, decided to breed Arabians instead. In 1965, petitioner purchased an Arabian stallion and began breeding part-bred Arabians. Within a few years he purchased a purebred Arabian mare and gradually *530 phased into breeding purebred Arabians. By 1975, 12 years after petitioner started his horse-breeding operation, his herd had swelled to about 50 to 60 horses, and it has remained at approximately that level up to the time of trial in 1982. In the record before us, we have information concerning the operation of the farm for a period of 18 years -- 1963 through 1980 -- and in each of those years, petitioner has incurred a substantial loss. Over the years, petitioner's losses have totaled $387,479.76. In support of his position that these losses were caused by fortuitous circumstances beyond his control, petitioner asserts that during 1972 and 1973, he lost "a number of foals" to disease. Petitioner, however, produced no evidence of how many foals were lost, nor the value of such foals. In addition, petitioner testified at trial that he lost some mares to colic. Again, he failed to produce any evidence on the number of mares lost or their value. Upon examination of petitioner's tax returns, petitioner reported two mares and two foals died during 1972, one mare died during 1975, and one mare died during 1978; petitioner also reported that he was compensated by insurance for *531 the deaths of one mare in 1972 and the mare in 1978. Furthermore, the insurance proceeds were in excess of his basis which resulted in taxable gain. While the death of these animals is unfortunate, we find that they had only an insignificant effect on the overall losses claimed for each respective year. [4]
We are also not persuaded that petitioner's losses during the years in issue were merely symptomatic of the early years of his breeding operation. By 1976, petitioner had been engaged in the horse-breeding business for over 13 years and during each of those years petitioner incurred *532 a substantial loss on his breeding activity. In 1976 and 1977, petitioner incurred losses of $28,030 and $43,239, respectively. In 1978, 1979, and 1980, petitioner experienced further losses of $20,466, $33,701, and $45,263, respectively. Overall, petitioner experienced 18 years of losses totaling $378,479.76. This record of such large losses over so many years is persuasive evidence that petitioner did not expect to make a profit on his horse-breeding activity. Golanty v. Commissioner,supra at 427. At trial petitioner failed to produce any evidence indicating that his horse-breeding activity would become profitable in the future. In fact, no projection of the activity's potential for profit or loss has ever been made, nor has a break-even point been calculated. Petitioner argues that he conducted the horse-breeding enterprise in a businesslike manner. In support of his position, petitioner points to separate books and records maintained for the farm, an accounting code system utilized to distinguish personal expenses from business expenses, and the maintenance *533 of accurate stallion reports and breeding records. These things alone are insufficient to demonstrate that the activity was a business carried on for profit. Golanty v. Commissioner,supra at 430. Petitioner did not show that the books and records were kept for the purpose of cutting expenses, increasing profits, or evaluating the overall performance of the operation. At trial, petitioner admitted that because of heart problems, he did not examine the financial statements prepared by his accountant during the years in issue. Moreover, at the time of trial, January 28, 1982, petitioner had not received any financial statements from his accountant for the year 1981 and was not aware of how much the horse-breeding activity had made or lost during 1981. Furthermore, in part, petitioner's records consisted of the pedigrees of his horses and their bloodlines which were required by the Arabian horse registry. The keeping of such records is not indicative that petitioner was in the business for profit. Such activity is as consistent with a hobby as it is with a business. *534 Golanty v. Commissioner,supra at 430. Similarly, petitioner's attempts to advertise his horse-breeding operation were not significant. An examination of petitioners' income tax returns during the years in issue indicates that during 1976 petitioner spent $556 on advertising while total farm expenses amounted to $21,618, and in 1977 petitioner spent $369 on advertising while total farm expenses amounted to $32,279.Such advertising was relatively insubstantial when compared to the overall cost of petitioner's operation. Petitioner argues that despite a series of substantial losses, the herd's appreciation in value offsets the aggregate losses. At trial, petitioner testified that during the years in issue, petitioner owned between 48 and 50 horses which were worth approximately $250,000. However, we do not accept petitioner's conclusory and self-serving statements as fact. See South Texas Rice Warehouse Co. v. Commissioner,366 F. 2d 890, 898 (5th Cir. 1966), affg. 43 T.C. 540 (1965), cert. denied 386 U.S. 1016 (1967). In a personal financial statement made out by petitioner in May 1975, petitioner's horses *535 were said to be worth $35,000. Moreover, the farm's balance sheet as of December 31, 1976, valued the breeding stock at $35,740, and its balance sheet of December 31, 1977, valued the breeding stock at $90,140. There is no other credible evidence indicating that petitioner's horses were worth $250,000. [5] Petitioner did not even produce records indicating the number of horses owned at any point in time, the purchase price, the date of birth, or the selling price. Therefore, we conclude that the balance sheets of December 31, 1976 and December 31, 1977, are the best indication of the value of petitioner's herd. It is clear, therefore, that the appreciation of the herd is insufficient to offset the aggregate losses from 1963 through the years in issue. [6]
*536 We also find that petitioner and his family took great personal pleasure and satisfaction in the operation of their horse farm and the showing of Arabian horses. Petitioner had a house and swimming pool on the farm. He lived there with his former wife and children prior to 1975 and with his present wife and children since their marriage in 1975. Although petitioner could not ride because of his heart condition, his children from his prior marriage, his second wife, Brenda, and her oldest son all enjoyed riding the horses on the farm as well as in shows. Moreover, petitioner kept a collection of ribbons and awards from the various shows in the family den. Quite simply, ownership of a farm was a fulfillment of petitioner's life-long ambition. When asked, "Why did you * * * decide to buy a farm * * *" petitioner responded: "Well, you get the boy out of the city, but you can't get the farm out of the boy, and I always wanted to be a country doctor and own my own farm, and I've been fortunate enough to be able to do both." Respondent maintains that petitioner was only able to "do both" because the actual after tax burden on petitioner was relatively slight. We agree. In the operation *537 of his horse-breeding enterprise, petitioner incurred total out-of-pocket expenses of $21,618 in 1976 and $32,279 in 1977. On their Federal income tax returns, petitioners deducted a loss of $28,030 in 1976 and a loss of $43,239 in 1977 from the operation of their horse farm. Their Federal income tax returns show that petitioner and his wife received income of $132,236 in 1976 and $162,801 in 1977. Petitioners' deductions from the horse-breeding operation resulted in a tax savings, as calculated in the statutory notice of deficiency, of $13,307 in 1976 and $23,044 in 1977. When this tax savings is subtracted from petitioners' out-of-pocket expenses, the result is that the net "after tax benefit" expenditures were $8,155 for 1976 and $6,707 for 1977. In summary, if petitioners are allowed to deduct the losses from the horse-breeding operation, the actual burden on them is relatively slight, that is, the after tax expenditure of $8,155 for 1976 represents only 6.2 percent of their gross income in that year and petitioners' after tax expenditure of $6,707 for 1977 represents only 4.1 percent of their gross income in that year.Such a burden is certainly not sufficient to indicate that *538 petitioner undertook the horse-breeding operation as a business from which he expected to make a profit. Golanty v. Commissioner,supra at 429. Finally, petitioner's horse-breeding activity shows no sign of producing a profit in the future. Despite large and increasing losses, petitioner made no attempt to reduce farm expenses or increase total farm income. Petitioner has failed to show that he sought or acquired the expertise that would enable him to turn his horse-breeding operation into a profitable business. Indeed, it strains credulity to believe that after experiencing 18 years of straight losses totaling $387,479.76, petitioner had an actual and honest profit objective in carrying on his horse-breeding operation. In conclusion, when all of the factors are weighed, we hold that petitioner's Arabian horse-breeding operation was an "activity * * * not engaged in for profit" within the meaning of section 183(a) and, therefore, the losses incurred by petitioner during 1976 and 1977 are only allowable to the extent provided in section 183(b). To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 as amended.↩
2. All figures are taken from petitioner's respective Federal income tax returns. * Years in issue. ↩
1. As reported on Schedule F (Farm income and expenses) attached to petitioner's tax returns. ↩
2. This includes stud fees, boarding fees, show winnings, and other miscellaneous income. ↩
3. $6,000 of this represents rent received from rental of barn space to third parties.↩
3. Compare Engdahl v. Commissioner,72 T.C. 659↩ (1979).
4. Petitioner reported losses from the breeding activities of $27,099.66 in 1972, $33,062 in 1975, and $20,466 in 1978. On his 1972 return the adjusted basis of the deceased mares was $5,910 and $2,344, and he received $6,000 in insurance proceeds. Also the highest reported price petitioner received for a foal in 1972 was $1,500. Petitioner's 1975 return indicates the deceased mare cost $4,000 and was depreciated to $2.375. On petitioner's 1978 return the deceased mare had an adjusted basis of $9,200.75 and he reported receiving $10,000 in insurance proceeds from the death of the mare.↩
5. While petitioner's witness, Gary Benefield, President of the Arabian Horse Services Company, also testified that petitioner's herd was worth $250,000, he was not familiar with the particular horses in the herd, or the number of mares, stallions, or foals in the herd during the years in issue. ↩
6. Respondent filed a motion to determine the inadmissibility of evidence and to exclude such evidence in which he argued against petitioner raising at trial the alleged appreciation in value of the 62.8-acre ranch as evidence of petitioner's intent to make a profit on the horse-breeding activity. Arguments were heard on this motion at the beginning of the trial. The premises considered, and taking into account all pertinent evidence in the record, respondent's motion was granted. We held that the appreciation of petitioner's 62.8-acre ranch and his horse-breeding activity constituted separate activities; therefore, the appreciation of petitioner's 62.8 acres of land cannot be considered in determining whether the horse farm operation was an activity engaged in for profit. The regulations provide that in determining whether various undertakings constitute a single activity or several activities, all the facts and circumstances of the case must be taken into account. Sec. 1.183-1(d)(1), Income Tax Regs. Generally the most significant facts and circumstances are the organizational and economic interrelationship of the activities; the business purpose served by carrying on the undertakings separately or together; and the similarity of the various activities. If a taxpayer engaged in two separate activities, deductions and income from each activity are not aggregated in determining whether an activity is engaged in for profit. Sec. 1.183-1(d)(1), Income Tax Regs. Moreover, the regulations specifically provide that "Where land is purchased or held primarily with the intent to profit from increase in its value, and the taxpayer also engages in farming on such land, the farming and the holding of the land will ordinarily be considered a single activity onlyif the farming activity reduces the net cost of carrying the land for its appreciation in value." [Emphasis added.] Petitioner argues that, because he purchased the land primarily to farm, the appreciation of the land and the farming must be considered as a single activity. While the regulations only specifically deal with the situation in which appreciation rather than farming is the primary intent, when land is purchased or held with the intent to farm, it does not automatically follow that the holding of land for appreciation and the farming must be considered a single activity. In such a situation, we must evaluate all the facts and circumstances of each case to determine whether the holding of land for appreciation and the farming of the land constitute a single or separate activity. Sec. 1.183-1(d)(1), Income Tax Regs.
In the case herein, petitioner's horse-breeding farm had no economic interrelationship with the holding of land for appreciation. In fact, year after year of substantial losses in the horse farm was an unnecessary economic burden to the holding of the land for appreciation. An unsuccessful farming operation cannot be carried on forever simply because the price of land in that general area is rising. See Jasionowski v. Commissioner,66 T.C. 312, 323 (1976). Therefore, upon considering all the facts and circumstances of this case, we conclude that appreciation of petitioner's 62.8-acre ranch cannot be considered in determining whether his horse-breeding farm was an activity engaged in for profit. See Estate of Elizabeth L. Power v. Commissioner,T.C. Memo. 1983-552. Compare Fields v. Commissioner,T.C. Memo. 1981-550; Ellis v. Commissioner,T.C. Memo. 1984-50↩.