WILLIAM A. PURDEY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Purdey v. Commissioner
Docket No. 48211-86
United States Tax Court
T.C. Memo 1989-657; 1989 Tax Ct. Memo LEXIS 654; 58 T.C.M. (CCH) 947; T.C.M. (RIA) 89657; December 14, 1989; As corrected December 21, 1989 Thomas E. Tyre, for the petitioner. Gerald R. Eure/Leslie J. Spiegel, for the respondent. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined deficiencies in petitioner's Federal income tax of $ 102,200 and $ 98,128 for 1982 and 1983, respectively. After concessions, the issue presented is whether petitioner engaged in a thoroughbred breeding and racing activity with an actual and honest profit objective. Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits *656 are incorporated herein by reference. For over 20 years, and at the time the petition in the instant case was filed, petitioner resided at a ranch called Greenfields Farm, which is located in Colts Neck, New Jersey. Greenfields Farm covers 114 acres and consists of a residence, living quarters for employees, barns, a stud shed, corrals, paddocks, and a utility building. The ranch does not have recreational facilities such as tennis courts or a swimming pool. Petitioner conducts a thoroughbred breeding and racing activity, which is centered at the ranch, where petitioner keeps stallions, broodmares, foals, yearlings, and horses of racing age. Petitioner personally manages his operation, making such decisions as whether to buy or sell a horse and which horses to breed. Petitioner also employs the services of a trainer, Harry Wells, who has worked for petitioner for approximately 16 years, and of a veterinarian, as well as four employees. Mr. Wells is paid a predetermined fee per horse per day (at the time of trial approximately $ 45), as well as a percentage of the horses' winnings (10 percent at the time of trial). Petitioner personally performs some day-to-day tasks at the *657 ranch, such as helping deliver foals. The breeding and foaling season runs from February through June of each year. During that time, broodmares are "covered" and foals are delivered. The training of petitioner's horses begins after they reach two years of age. At that time, Mr. Wells takes the horses to North Carolina, where they are "broken in." Then, the horses begin their training at Monmouth Park, a racetrack in New Jersey, or in Florida during the winter. In June, the racing season begins at Monmouth Park, and petitioner races horses there and at other tracks, including that at the Meadowlands, also in New Jersey. Each year, petitioner's horses run in approximately 60 to 70 races. The racing career of a horse usually ends when the horse reaches five or six years of age. One of petitioner's experts valued the ranch itself at approximately $ 4 million as of early 1988. Another expert offered by petitioner valued the horse herd at approximately $ 1 million as of December 31, 1987. At the time, the herd contained 10 broodmares, two stallions, six foals, and nine race horses. Petitioner inherited the ranch from his mother, who died testate on May 19, 1967. His mother's *658 Federal estate tax return reported the value of the ranch at approximately $ 350,000 and the value of the horse herd at approximately $ 74,000. The ranch has been in petitioner's family for three generations, having been acquired by his grandparents. Petitioner's grandfather was an original member of the Board of Directors of Monmouth Park racetrack and owned a box at the track. Petitioner lived and worked on the farm as a child. Then, after his mother's death, petitioner returned to the ranch after having spent two years at college, four years in the Navy, and working for a time as a newspaper sports writer. Petitioner's thoroughbred breeding and racing activity produces income in the form of racing purses, horse sale gains, stud fees, boarding fees, and New Jersey State Breeders Awards. The latter amounts are paid pursuant to a program administered by the New Jersey Racing Commission with the assistance of the New Jersey Thoroughbred Breeders' Association. If a horse conceived in New Jersey wins a race in New Jersey, the breeder (we presume the owner of the broodmare) receives an amount equal to 35 percent of the horse's earnings from the race. If the horse was conceived *659 outside of the state, the breeder receives an amount equal to 25 percent of the earnings. Also, the owners of stallions whose progeny win New Jersey races receive amounts equal to 10 percent of the earnings. For 1987, petitioner was the second-leading award winner under the program. Despite the foregoing revenues, since 1967, petitioner's thoroughbred breeding and racing activity has produced the following results: Portion of Loss Due to: [1]
Year
Loss [2]
Depreciation
Interest
Taxes
Insurance
1967
$   13,553
$   5,304
$ 1,010
$ -   $      -   1968
54,541
10,024
-
-   $ 1,479  1969
61,579
10,024
-
-   1,998  1970
50,556
9,813
-
-   1,289  1971
47,998
6,986
-
-   1,704  1972
32,744
6,924
-
-   1,660  1973
9,748
7,478
-
-   1,763  1974
18,619
10,821
-
-   1,992  1975
13,932
8,365
-
-   8,208  1976
55,283
7,149
-
-   -   1977
64,259
6,562
-
-   7,111  1978
85,116
6,874
-
1,401
8,998  1979
103,760
10,091
-
-   7,???  1980
174,479
12,106
-
-   4,253  1981
92,594
16,094
-
1,181
21,925  1982
250,705
18,431
-
10,628
25,170  1983
209,685
18,679
-
4,955
23,676  1984
216,855
17,088
-
-   34,375  1985
198,281
16,851
-
90? 21,295  1986
117,819
18,788
1,546
15,254  Totals
$ 1,872,104
$ 224,360
$ 1,010
$ 20,611
$189,150 *660 One explanation offered by petitioner for the foregoing record is the accidental death of one of his stallions, Shore Patrol, in 1980. Shore Patrol had been earning stud fees of approximately $ 1500 per engagement. Another circumstance cited by petitioner is the closing of a racetrack, Garden State, from approximately 1977 through 1985. Petitioner, however, did not race horses at that track in 1985, 1986, or 1987. Petitioner's stated objective is to produce a "stakes winner" and profit from its syndication. Races are classified as either claiming races, allowance races, or stakes races. The latter feature the highest quality horses. Petitioner cites Spectacular Bid as an example of a syndicated stakes winner. Petitioner also testified that his strategy is to breed horses with *661 demonstrated speed with those showing endurance. To date, petitioner's most successful horse has been Spruce Fir, one of the best thoroughbreds on the east coast. For the year of trial, Spruce Fir was the leading stakes winner in New Jersey. The horse has won approximately $ 400,000 in earnings and was recently named the best thoroughbred of the year by the New Jersey State Department of Agriculture. Another horse owned by petitioner, Inquire, was named three-year old filly of the year in 1981 by the New Jersey Thoroughbred Breeders' Association. Petitioner has maintained records for the activity since 1967 which itemize various expenses such as trainer's fees, boarding costs, and feed. At least for earlier years, the records combined personal and activity expenses. For example, costs of electricity, telephone, and heat were not allocated so as to reflect residential and activity use. Also, the records itemize costs for auto repair, gas, land taxes, and house repairs, although at least portions of those costs do not appear to be attributable to the activity. The books were originally organized by the wife of a trainer. Petitioner has consulted with his trainers and veterinarians *662 regarding breeding and racing decisions. Petitioner also consults industry literature. He is a trustee and past president of the New Jersey Thoroughbred Breeders' Association and a member of a number of horseman organizations, including the Jockey Club. In 1980, he represented both the New Jersey Thoroughbred Breeders' Association and the Jockey Club at a meeting of the National Thoroughbred Breeders' Association. Petitioner has advertised the services of his stallions in trade publications. Petitioner insures only his best horses. For example, since 1987, only Spruce Fir has been insured (at a value of $ 400,000). Petitioner has made some capital improvements to the ranch. He erected new barns in 1974, 1978, and 1979. He has recently purchased a horse van. Petitioner owns a box at Monmouth Park and regularly attends races at that track. The box, like the ranch, has been in his family for three generations. As noted, petitioner currently resides at the ranch, as do his wife and two children, who keep riding horses. Petitioner was married on the ranch. He invites guests to his home for dinner but does not do other entertaining there. Petitioner devotes all of his time to *663 the thoroughbred breeding and racing activity. His income derives mainly from certain trusts administered by Chase Manhattan Bank. A vice president with the bank valued the trust assets at approximately $ 4 million as of the time of trial. From 1977 through 1986, petitioner reported receipt of the following amounts of unearned income: Schedule E
Year
Dividends
Interest
Capital Gains
Income
1977
$  85,097.29
$    207.50
$  10.770.64 $ 19,646.73
1978
95,871.16
1,597.84
11,003.81 23,319.31
1979
68,439.00
161.00
30,643.00 17,918.00
1980
110,585.00
195.00
9,530.00 26,967.00
1981
121,186.00
40,543.00
( 68,050.00)
1,372.00
1982
116,897.00
1,358.00
199,104.00 37,780.00
1983
100,234.00
831.00
72,877.00 27,999.00
1984
112,209.00
2,248.00
77,464.00 20,880.00
1985
106,095.00
2,644.00
76,636.00 23,080.00
1986
103,328.00
3,284.00
349,321.00 11,568.00
OPINION Respondent asserts that petitioner did not conduct the thoroughbred breeding and racing activity with an actual and honest profit objective and that, therefore, losses for the years in issue are nondeductible. Petitioner contends *664 that he engaged in the activity with the requisite profit objective and that he is, therefore, entitled to deduct activity expenses in excess of revenue. Petitioner bears the burden of proof. Rule 142(a). Section 183(a) supplies the general rule which disallows all deductions attributable to activities "not engaged in for profit." Section 183(b)(1), however, qualifies the general rule by permitting those deductions otherwise allowable regardless of profit objective, e.g., interest and State and local taxes. Further, section 183(b)(2) permits those deductions which would be allowable if the activity were engaged in for profit, but only to the extent that gross income attributable to the activity exceeds the deductions permitted by section 183(b)(1). Section 183(c) defines a section 183 activity as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Deductions under sections 162 or 212(1) *665 or (2) require the "actual and honest objective of making a profit." Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). A taxpayer's expectation of profit, however, need not be "reasonable." Sec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner, supra at 644-645. Whether a taxpayer has an actual and honest profit objective is determined on the basis of all surrounding circumstances. Sec. 1.183-2(b), Income Tax Regs.; Dreicer v. Commissioner, supra at 645. We give greater weight to objective facts than to a taxpayer's statements of intent. Sec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner, supra at 645. Section 1.183-2(b), Income Tax Regs., contains a nonexclusive list of objective factors to be considered. The factors are: (1) *666 the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor is determinative; all facts and circumstances, including those not listed, should be considered; and we do not resolve the issue of profit objective by simply comparing the number of factors indicating profit objective with these indicating the lack of such objective. Sec. 1.183-2(b), Income Tax Regs.; Abramson v. Commissioner, 86 T.C. 360, 371 (1986). Having considered the entire record and having given due regard to petitioner's burden of proof, we conclude that petitioner did not engage in his thoroughbred breeding and *667 racing activity with an actual and honest profit objective. The activity produced mounting losses over a 20-year period. Sec. 1.183-2(b)(6) and (7), Income Tax Regs. In Golanty v. Commissioner, supra, we held that a horse breeder who had suffered increasing losses over seven years lacked the requisite profit objective. We noted, "Although no one factor is determinative of the taxpayer's intention to make a profit * * *, a record of substantial losses over many years and the unlikelihood of achieving a profitable operation are important factors bearing on the taxpayer's true intention." 72 T.C. at 426. We also stated, "A record of such large losses over so many years is persuasive evidence that the petitioner did not expect to make a profit." 72 T.C. at 427. Petitioner asserts that the activity produced a profit of some $ 13,000 in 1987. Yet, the only evidence supporting petitioner's contention is an unfiled Schedule F. Moreover, the $ 13,000 profit appears to be the product of accounting machinations. For example, for the first time, utility expenses *668 were pro rated so that only a portion were attributed to the activity, and the payment of insurance premiums was deferred until 1988. Petitioner has not produced credible evidence that his operation has become profitable. Further, even accepting the accuracy of the proffered Schedule F, petitioner has not shown us that he realistically can expect to recover the losses sustained over the 20 previous years. In Bessenvey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967), we stated, the presence of losses in the formative years of a business, particularly one involving the breeding of horses, is not inconsistent with an intention to achieve a later profitable level of operation, bearing in mind, however, that the goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years. Had petitioner offered some credible explanation for the operation's history, we might have been willing *669 to discount its relevance. Section 1.183-2(b)(6), Income Tax Regs., states as follows: where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable, as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit. * * * Petitioner's explanations for the activity's history are not convincing. Petitioner points to the death of one horse, Shore Patrol, in 1980, and the closing of the Garden State racetrack from 1977 through 1985. We are not persuaded that those events account for the activity's dismal profit performance. Shore Patrol earned relatively low stud fees, and petitioner did not utilize the Garden State racetrack after its reopening. Petitioner offered no credible evidence that he attempted to increase the profitability of his activity by modifying operations. See sec. 1.183-2(b)(1), Income Tax Regs. Perhaps petitioner's failure to show any effort to *670 increase the profitability of his activity is the factor we view as most crucial to the outcome of the instant case. Despite suffering year after year of escalating losses, it was "business as usual" at Greenfields Farm. We believe that a taxpayer having an actual and honest profit objective would have become concerned by the activity's poor performance and would have implemented cost-cutting and revenue-enhancing measures, or both such measures, in order to improve results. Any adaptive behavior, even if unsuccessful, would have evinced a concern for profitability. Petitioner points to his purchase of a horse van. Yet, he did not show that he compared the cost of transporting horses by his own van with the cost of hiring transportation. Thus, we are not persuaded that the purchase of the van was a cost-cutting measure. In any event, in view of the mounting losses, the purchase of a van represented, at best, too little, too late. Petitioner also points to capital improvements at the ranch. Petitioner has not explained, however, how such improvements could have reduced costs. In sum, petitioner has not shown that he ever seriously assessed his business and implemented changes *671 designed to improve profitability. Petitioner's willingness to sustain mounting losses would have been explicable if he were conducting the activity in the hopes of profiting from appreciation in the value of assets used in the activity. Petitioner, however, has failed to demonstrate that such appreciation could realistically offset the losses accumulated over more than 20 years. Besssenyey v. Commissioner, supra at 274. The record shows that petitioner suffered losses over 20 years totalling $ 1,872,104. Meanwhile, petitioner's own expert valued the herd at only $ 992,000 to $ 1,027,000 as of December 31, 1987. Although petitioner points to the value of the ranch, we do not consider the ranch's value relevant to the issue of profit objective in the instant case. The regulations address the issue of whether the acquisition and/or retention of real property should be considered part of an "activity" for section 183 purposes. They provide as follows: Where land is purchased or held primarily with the intent to profit from increase in its value, and the taxpayer also engages *672 in farming on such land, the farming and holding of the land will ordinarily be considered a single activity only if the farming activity reduces the net cost of carrying the land for its appreciation in value. Thus, the farming and holding of the land will be considered a single activity only if the income derived from farming exceeds the deductions attributable to the farming activity which are not directly attributable to the holding of the land (that is, deductions other than those directly attributable to the holding of the land such as interest on a mortgage secured by the land, annual property taxes attributable to the land and improvements, and depreciation of improvements to the land). Sec. 1.183-1(d)(1), Income Tax Regs. In the instant case, even assuming that the farm was "purchased or held primarily with the intent to profit from increase in its value," petitioner has not met the second requirement of the regulation, namely, that the activity "reduces the net cost of carrying the land for its appreciation in value." Petitioner's thoroughbred breeding and racing activity did not produce income in excess of deductions, even after deductions *673 "attributable to the holding of the land" are disregarded. The stipulated losses set forth in our findings above represent the losses reported on petitioner's Schedule F for each year, less any gains reported on other parts of petitioner's returns. They generally do not reflect interest expense of any sort. Nor do they generally reflect State or local taxes of any kind. They do include depreciation of improvements to the ranch, e.g., barns, and of other property, and insurance, an unknown portion of which may cover improvements to real property. Even a cursory examination of petitioner's returns, however, reveals that the thoroughbred breeding and racing activity did not come close to generating revenues in excess of expenses other than those attributable to the retention of the ranch. Even after disregarding all depreciation, interest, taxes, and insurance, the activity lost a substantial sum, i.e., $ 1,436,973 ($ 1,872,104 - ($ 224,360 + $ 1,010 + $ 20,611 + $ 189,150)). Thus, the activity did not facilitate petitioner's "holding" of the ranch for appreciation, and petitioner may not characterize retention of the ranch as part of the activity which must be conducted for *674 profit. In Boddy v. Commissioner, T.C. Memo. 1984-156, affd. without published opinion 756 F.2d 884 (11th Cir. 1985), we cited section 1.183-1(d)(1), Income Tax Regs., and stated that the taxpayer's "horse-breeding farm had no economic interrelationship with the holding of land for appreciation. In fact, year after year of substantial losses in the horse farm was an unnecessary economic burden to the holding of the land for appreciation." 47 T.C.M. 1381, 1388 n.6, 53 P-H Memo T.C. par. 84,156 at 84-554 n.6. Compare Engdahl v. Commissioner, supra at 668-669 (Property was purchased primarily for horse farming and was marketed for sale after taxpayers realized they could not profit from operations.). Moreover, petitioner cannot point to appreciation of the ranch in support of his claim of profit objective because the ranch would have appreciated regardless of whether or not petitioner conducted his activity there. Petitioner's own expert testified that the highest and best use of the ranch was not as a horse farm. *675 If petitioner were truly interested in profit, he would have discontinued his activity and simply held on to the ranch for whatever period he thought appropriate from a financial standpoint. Instead, he conducted an activity which has negated a substantial portion of the appreciation in the ranch's value since he inherited it from his mother in 1967. Since his mother's death, petitioner has received substantial annual income from trusts. Sec. 1.183-2(b)(8), Income Tax Regs. Indeed, petitioners could not have continued to fund the activity without such income. We are not saying, however, that he engaged in the thoroughbred breeding and racing activity in order to avoid taxes. Clearly, there is no benefit to losing money when the resulting tax savings represents less than 100 percent of the loss. Engdahl v. Commissioner, supra at 670. Petitioner's substantial income did, however, enable him to engage in a pursuit primarily for personal reasons and seek to have the government subsidize a portion of the activity's costs. We also note that petitioner regularly attended races at Monmouth Park, where he had a box originally acquired by his family *676 two generations ago. His grandfather had been an original member of the Board of Directors of the Monmouth Park racetrack. Given the objective facts in the instant case, we must conclude that petitioner engaged in his operation and sustained continuing losses in order to maintain a lifestyle to which he had become accustomed. Sec. 1.183-2(b)(9), Income Tax Regs.
We are not oblivious to the factors in the instant case which evince a profit objective. Except for the derelictions we have noted, the activity was conducted in a businesslike manner. Petitioner's records appear fairly detailed and accurate, although the combination of personal and activity costs is troublesome. Sec. 1.183-2(b)(1), Income Tax Regs. Also, petitioner made use of competent professionals such as trainers and veterinarians. Sec. 1.183-2(b)(2), Income Tax Regs. He devoted all of his time, effort, and a good deal of his money to the activity. Sec. 1.183-2(b)(3), Income Tax Regs. Yet, these factors are consistent with our finding that petitioner was an avid horseman of means, one who chose to devote *677 substantial resources to an endeavor to which his grandfather had devoted himself. On the other hand, it is very difficult, if not impossible, to reconcile 20 years of mounting losses with a profit objective, especially in the absence of special circumstances or adaptive behavior. Although petitioner argues that the activity commenced in 1972, the record discloses otherwise. As noted, his grandfather was a horseman. We reject petitioner's argument that the activity has lost money for 15 rather than 20 years. Petitioner cites a number of cases in support of his claim of profit objective. Because the issue of profit objective is resolved on the basis of all facts and circumstances, the precedential value of any case is limited. Nevertheless, we address some of our precedents. In Cronhardt v. Commissioner, T.C. Memo. 1986-399, the fact that the taxpayers devoted substantial time to the horse breeding operation was but one factor we noted in finding a profit objective. We noted a number of other factors, including the fact that the taxpayers looked to the horse operation *678 for steady income following the husband's retirement. Similarly, in Soloman v. Commissioner, T.C. Memo. 1967-186, we cited several considerations in finding profit objective. The taxpayer's devotion of labor and money to the operation was not determinative. Rather, that case involved "modest losses in the early years of * * * [the taxpayer's] venture." In Lauer v. Commissioner, T.C. Memo. 1961-208, the time and effort devoted by the taxpayer to the activity was accompanied by "a reasonable expectation of ultimately operating at a profit." Starr v. Commissioner, T.C. Memo. 1969-35, involved taxpayers of "relatively modest means," and we found it unlikely that they would have spent as much as they did on a mere "hobby." Petitioner, by contrast, appears quite capable of absorbing the activity's recurring losses. In Babbitt v. Commissioner, 23 T.C. 850 (1955), the taxpayer exhibited adaptive behavior and managed to operate at a profit after some 12 years of losses. In Meagher v. Commissioner, T.C. Memo. 1986-116, we held that the taxpayer had adequately explained seven years of losses. In *679 Seebold v. Commissioner, T.C. Memo. 1988-183, we did note the taxpayers' "relatively modest" income relative to the activity's losses, but that case also involved six years of decreasing losses, with a projected turnaround in the seventh year of operation. In Appley v. Commissioner, T.C. Memo. 1979-433, the activity had become profitable after a period of decreasing losses. We have considered petitioner's other arguments and find them to be without merit. Because petitioner did not engage in the thoroughbred breeding and racing activity with an actual and honest profit objective, the activity falls within the scope of section 183. Accordingly, respondent properly disallowed losses attributable to the activity for the years in issue. Because of concessions and in order to reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. These figures were taken from petitioners' Federal income tax returns. Petitioner depreciated certain improvements to real property, and other property, including horses, fencing, and equipment. Further, no attempt has been made to allocate interest, taxes, or insurance to costs attributable to real property and costs attributable to other property. ↩
2. These figures were stipulated.↩