T.C. Memo. 1998-330


UNITED STATES TAX COURT


MARTIN AND MARION ABBENE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 16788-95.                    Filed September 21, 1998.


<u>Martin H. Bodian</u>, for petitioners.

<u>Linda P. Azmon</u> and <u>Gary W. Bornholdt</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income tax in the amounts of $18,905,
$16,465, and $15,434 for taxable years 1990, 1991, and 1992,
respectively.  Petitioners Martin Abbene and Marion Abbene will
individually be referred to as Mr. Abbene or Mrs. Abbene,
respectively.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions by petitioners, the issue remaining to be decided is whether petitioners may deduct losses incurred by Mr. Abbene's wholly owned S corporation, Blue Ribbon Thoroughbred Breeding Farms, Inc. (Blue Ribbon), in its horse-related activities, or whether such losses are nondeductible because Blue Ribbon did not engage in such activities for profit within the meaning of section 183(a).

                    FINDINGS OF FACT

Some of the facts have been stipulated for trial pursuant to Rule 91. The parties' stipulations of fact are incorporated herein by reference and are found as facts in the instant case. At the time they filed their petition, petitioners resided at 6 Tide Mill Road, Nissequogue, New York (6 Tide Mill Road). Petitioners are husband and wife and have one child, Elena Abbene (Elena), born on October 27, 1967. During the years in issue, Elena lived with petitioners, who were her sole means of support. Petitioners filed timely joint Federal income tax returns for all years in issue.

Prior to and during the years in issue, Mr. Abbene was employed as a sales representative with Pride Solvents & Chemical

Company, Inc. (Pride Solvents).[1]  Mrs. Abbene was employed as a

registered nurse.

## Mr. Abbene's Horse-Related Activities Before the Incorporation of Blue Ribbon

Mr. Abbene's involvement with horses began when, at the age

of 17,[2] he first owned and rode horses for pleasure.  Mr. Abbene

has maintained horses for showing, riding, and breeding since

1971.  Although Mr. Abbene was never formally trained to show or

breed horses, he was active in several horseman's associations

both before and during the years in issue. Specifically, Mr.

Abbene belonged to the New York Thoroughbred Breeder's

Association, the Professional Horseman's Association of Long

Island, and the Nassau-Suffolk Horseman's Association.[3]

Petitioners' daughter, Elena, began riding horses during

1970, at the age of 3, following a 50-cent pony ride.  Elena has

trained with the United States Equestrian Team since age 15 and

is a 1989 Olympic Bronze Medalist.[4]  Petitioners spent $30,000 to

---

[1]    Mr. Abbene was employed with Pride Solvents for 21 years from 1974 until 1995.

[2]    Mr. Abbene was born on Jan. 17, 1941.

[3]    Mr. Abbene served as the director of the Nassau-Suffolk Horseman's Association for approximately 10 years from 1984 to 1994.

[4]    The parties stipulated that Elena "is a 1989 Olympic bronze medalist."  The record, however, also contains a business card on which it is advertised that Elena is "a 1989 U.S. Olympic Festival Bronze Medal Winner".  Whether Elena participated in

(continued...)

$50,000 of their own funds each year to cover Elena's training and competition costs.

During 1975, petitioners purchased the 1½ acre property located at 6 Tide Mill Road (the property), and they have maintained the property as their primary residence every year since then. At the time it was purchased, there was a 13-room house on the property, but there was no barn. Sometime during either 1976 or 1977, petitioners built a barn on the property, at a cost of $2,600. Two years later petitioners built a second barn on the property, to match the first, also at a cost of $2,600. During 1988, petitioners built a third barn on the property, at a cost of $49,870, after one of the original barns was destroyed by fire.[5]

During the years subsequent to the purchase of the property, Mr. Abbene purchased the following horses and equipment, ownership and title to which are in his name individually, for use in connection with his horse-related activities:

## Horses

| Name | Type of Horse | Purchase Price | Year Purchased[1] | Year Born | Year Died |
|------|---------------|----------|-----------|------|------|
| Country Girl | Female Welsh pony | $750 | 1976/1977 | 1959 | 1995 |
| Nakita | Female Shire | 2,200 | 1976/1977 | 1970/1971 | [2] |

---

[4](...continued)
official Olympic competition during 1989 or in an "Olympic Festival", however, is immaterial to our analysis.

[5] The record does not disclose which of the two original barns was destroyed by fire.

| Toast of the Town | Gelded | Thoroughbred | 1,500 | 1976/1977 | 1973 | 1994 |
|---|---|---|---|---|---|---|
| Meadow Silk Spirit | Female | Welsh pony | 800 | 1976/1977 | [3] | [2] |
| Spectacular Rhythm | Female | Thoroughbred | 5,000 | 1984 | 1979 | [2] |
| Magic Moment | Gelded | Thoroughbred | 4,000 | 1986 | 1974 | 1991 |
| King Lion | Gelded | Irish Warmblood | 63,000 | 1987 | 1981 | [2] |

[1]Before the incorporation of Blue Ribbon, no horses were sold.
[2]Date of death not disclosed in the record.
[3]Date of birth not disclosed in the record.

Equipment

| Type | Purchase Price | Year Purchased |
|---|---|---|
| Pickup truck | $10,321 | 1978 |
| Trailer | 17,500 | 1987 |
| Riding equipment | 10,000 | 1986-88 |
| Coral and fencing | 5,000 | 1988 |

During the years preceding the incorporation of Blue Ribbon, Elena competitively rode several of her father's horses including Country Girl,[6] Meadow Silk Spirit, and Magic Moment.[7]  Elena, an accomplished rider, also won many ribbons for showing Magic Moment, Toast of the Town, Nakita, and Spectacular Rhythm.

Before the incorporation of Blue Ribbon, Mr. Abbene maintained a separate checkbook for all of the expenditures that he incurred for his showing, riding, and breeding activities. Mr. Abbene also maintained a log showing all the competitions in which he entered horses.  Mr. Abbene never realized a profit from his horse-related activities during the period from 1971 to 1989.

---

[6]     Elena rode Country Girl in the national championships.

[7]     Elena rode Magic Moment, a jumper, in the national championships and in Olympic competition.

Operation of Blue Ribbon

Sometime before January 24, 1989, Capital Cities/ABC, Inc. (ABC), approached Mr. Abbene about the possibility of using King Lion in the filming of an episode of one of its daytime dramas, "All My Children" (AMC). On January 27, 1989, Mr. Abbene incorporated Blue Ribbon in order to take advantage of the opportunity to rent his horse to ABC, which dealt only with corporations.

Mr. Abbene is Blue Ribbon's sole shareholder. Blue Ribbon conducts its operations on the property using Mr. Abbene's horses and equipment.[8] Mr. Abbene never transferred ownership of the horses and equipment or the property to Blue Ribbon. Blue Ribbon never paid petitioners any rent or income for the use of the property or the horses and equipment in its operations.

On January 24, 1989, 3 days before Blue Ribbon's incorporation, Mr. Abbene entered into an agreement with ABC, on Blue Ribbon's behalf, to rent certain horse-riding equipment to ABC for $10,400. On February 8, 1989, Blue Ribbon entered into a second agreement with ABC to rent King Lion to ABC for $3,432. ABC rented the horse and the riding equipment for use in the filming of an episode of AMC during February 1989. During

---

[8]    In addition to the horses listed supra p. 4, Mr. Abbene acquired Queenie, a female Shire, during either 1990 or 1991. Queenie was not used by Blue Ribbon for any income-producing activity.

November 1990, the major Hollywood film and television producers began a boycott against Local 52 of the International Alliance of Theater Stage Employees and Moving Picture Machine Operators (Local 52), which significantly lessened film and television production in the New York City metropolitan area. The boycott against Local 52 was settled during May 1991. Neither Blue Ribbon nor Mr. Abbene had any further dealings with ABC after the February 8, 1989, agreement.

During the years in issue, Blue Ribbon engaged solely in the activities of horse breeding, horse showing, and providing riding lessons. Neither Mr. Abbene nor Blue Ribbon sold any horses during the years in issue.

Nakita and Spectacular Rhythm were maintained for breeding purposes. Mr. Abbene hired a veterinary doctor to do all of the breeding because neither he nor Elena had any veterinary training. Nakita produced no foals, and Spectacular Rhythm produced only one foal, Precious Moment. Precious Moment was born stunted, during 1991. Mr. Abbene made no attempt to breed Spectacular Rhythm after the birth of Precious Moment.

Blue Ribbon entered approximately 25 to 30 horse shows each year during the years in issue. King Lion, however, was the only horse shown by Blue Ribbon for prize moneys.[9] Aside from $6,500

_____

[9] We make this finding notwithstanding Mr. Abbene's testimony that Nakita was also shown for prize moneys. The parties

(continued...)

that King Lion won during 1990, placing second at the Hamptons Classic, King Lion won no prize moneys during the years in issue. Mr. Abbene kept no formal ledger of King Lion's winnings. The remaining horses were generally shown for ribbons only. Country Girl, Toast of the Town, Meadow Silk Spirit, and Spectacular Rhythm, however, were not shown during the years in issue. Magic Moment was injured and had to be destroyed during 1991.[10]

Blue Ribbon used Country Girl, Toast of the Town, and Meadow Silk Spirt for riding lessons. During the years in issue, Elena provided, on behalf of Blue Ribbon, riding lessons to four individuals, some of whom went on to successfully compete. Blue Ribbon charged $30 for a half-hour lesson and $50 for an hour lesson. Mr. Abbene maintained neither a log of the riding lessons given by Elena nor a formal ledger of the income derived from the provision of riding lessons during the years in issue.

---

[9](...continued)
stipulated that King Lion was the only horse shown for prize moneys. Consistent with the stipulation of facts, respondent requested the Court to find that King Lion was the only horse shown for prize moneys during the years in issue. As petitioners made no objection to the requested finding of fact, we shall treat the stipulation of facts as a conclusive admission by the parties. Rule 91(e).

[10]    The record does not disclose the year in which Magic Moment suffered injury.

Mr. Abbene and Elena managed Blue Ribbon's day-to-day operations.[11]  Blue Ribbon, however, had no paid employees during the years in issue, and Mr. Abbene kept no record of the number of hours that either he or Elena worked.

Mr. Abbene normally devoted time to Blue Ribbon after work and on weekends.  Mr. Abbene also spent much of his vacation, 2 months each year, and holidays traveling with the horses for shows.  While he was at work, Mr. Abbene left Elena in charge of Blue Ribbon's operations.

Elena worked approximately 50 hours each week at Blue Ribbon where she was responsible for (1) the general care and maintenance of the horses, (2) training, preparing, and riding the horses shown by Blue Ribbon in competitions, and (3) providing riding lessons on behalf of Blue Ribbon.  Elena also had the authority to make purchases on behalf of Blue Ribbon, although she did not maintain or review any records concerning Blue Ribbon's expenditures.  Before 1989, Elena had no experience operating a business.  Elena did not attend college and had no formal business education.

Mr. Abbene had business cards made, highlighting Elena's 1989 Olympic Bronze Medal, to advertise the services offered by Blue Ribbon.  The cards were dispersed through the mail and given

---

[11]    Mrs. Abbene had no active involvement in Blue Ribbon's operations and did not take part in any of the decision making concerning its operations.

to local tack shops, where they were either displayed near the cash register or posted on a bulletin board. Mr. Abbene also advertised Blue Ribbon's services by circulating a rate schedule to approximately 100 individuals included on a mailing list that he purchased from the American Horse Show Association.[12] Blue Ribbon claimed advertising expenses in the amounts of $925 for 1990, $351 for 1991, and $549 for 1992.

Mr. Abbene paid an accountant, George Seaford (Mr. Seaford), to maintain Blue Ribbon's records during the years in issue. Although Mr. Abbene kept a separate bank account for Blue Ribbon's expenditures, he did not keep a formal ledger of Blue Ribbon's income. Rather, Mr. Abbene would place photocopies of the checks received for riding lessons and prize winnings in an envelope which was forwarded, every 3 months, along with the bank statements to Mr. Seaford. Mr. Seaford performed quarterly reconciliations of the bank statements and prepared Blue Ribbon's Federal income tax returns.

During the years in issue, Mr. Abbene did not maintain any formal business plan or formal business strategy for the operation of Blue Ribbon. Mr. Abbene did not prepare or maintain any formal budgets, operating statements, or analyses of Blue

---

[12] Petitioners attached to their posttrial brief photocopies of two advertisements purportedly placed in the New York Production Guide during the years in issue. These advertisements are not part of the record in the instant case, and we give them no consideration in our analysis.

Ribbon's records to determine how costs could be controlled.  Mr. Abbene did not formally calculate the amount of income that would be required to produce a profit, and he did not attempt to project the amount of income necessary to produce a profit for future years.  Mr. Abbene never formally calculated the income required to recover the losses sustained by Blue Ribbon during the years in issue.

Although Blue Ribbon has operated at a loss every year since its inception, Mr. Abbene has made no change to the manner in which Blue Ribbon conducts its operations.  Mr. Abbene cannot presently say when or whether Blue Ribbon will become profitable. Blue Ribbon's Forms 1120S reported the following income, expenses (including depreciation), and net losses during the period from 1989 to 1994:

| Year | Income | Expenses & Depreciation | Net Loss |
|------|--------|-------------------------|----------|
| 1989 | $13,000 | $34,518 | $21,218 |
| 1990 | 6,500 | 65,309 | 58,809 |
| 1991 | 1,785 | 59,584 | 57,799 |
| 1992 | 2,950 | 63,967 | 61,017 |
| 1993 | 313 | 62,951 | 62,638 |
| 1994 | 450 | 60,164 | 59,714 |

On its returns for taxable years 1989 through 1994, Blue Ribbon claimed depreciation deductions relating to the assets used in its operations despite the fact that Mr. Abbene never transferred

ownership of those assets to the corporation.[13]  On its 1991 Form
1120S, Blue Ribbon also reported a section 1231 loss on the
destruction of Mr. Abbene's horse, Magic Moment, in the amount of
$2,880.

Petitioners reported combined gross income of $134,629 for
1990, $112,136 for 1991, and $110,245 for 1992.  Petitioners
claimed losses in the amounts of $58,809, $57,799, and $61,017
for 1990, 1991, and 1992, respectively, as Mr. Abbene's
distributive share of Blue Ribbon's operating losses.[14]  For
1991, petitioners also claimed $2,880, as Mr. Abbene's
distributive share of the section 1231 loss Blue Ribbon claimed
on the destruction of Magic Moment.

---

[13]    Mr. Abbene indicated at trial that Blue Ribbon did not own
the assets used in its operations and for which it claimed
depreciation deductions during the years in issue.  Accordingly,
at the close of trial, respondent made an oral motion pursuant to
Rule 41(b) to amend the pleadings to conform to the evidence in
order to assert, in the alternative, that petitioners are not
entitled to claim losses in connection with the operation of Blue
Ribbon to the extent that such losses represent depreciation
deductions.  We denied respondent's motion on the grounds that
the depreciation issue was not tried by either express or implied
consent of the parties.  Rule 41(b).  Consequently, the issue of
whether Blue Ribbon was entitled to depreciation deductions in
connection with the assets owned by Mr. Abbene, but used in its
operations, is not properly before the Court, and is not
considered in this opinion.

[14]    Petitioners claimed a loss from the operation of Blue Ribbon
in the amount of $62,638 for 1993.  Petitioners claimed no losses
from the operation of Blue Ribbon for 1994, 1995, or 1996.  While
the record discloses a loss of $59,714 for 1994, there is no
evidence of the amount of income or loss from the operation of
Blue Ribbon for 1995 or 1996.

Respondent determined that Mr. Abbene's distributive share of Blue Ribbon's losses for each year in issue was zero because Blue Ribbon's activities were activities not engaged in for profit within the meaning of section 183.

OPINION

Petitioners claim entitlement to Mr. Abbene's share of Blue Ribbon's losses for the taxable years in issue.  Petitioners argue that the losses are fully deductible because Blue Ribbon engaged in the activities of horse breeding, horse showing, and providing riding lessons with the requisite profit objective.  Petitioners contend that Mr. Abbene formed Blue Ribbon to take advantage of the opportunity to do film and television work with ABC and that he hoped to capitalize on Elena's fame as an Olympic medalist and skill as an accomplished rider to make Blue Ribbon a profitable operation.  Respondent contends that the activities were not engaged in for profit.  Petitioners bear the burden of proof.[15]  Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111 (1933).

Section 1366(a) generally allows shareholders of S corporations to take into account their pro rata share of the

---

[15]    Internal Revenue Service Restructuring & Reform Act of 1998 (RRA of 1998), Pub. L. 105-206, sec. 3001, 112 Stat. 685, 726-727, added sec. 7491, which shifts the burden of proof to the Secretary in certain circumstances.  Sec. 7491 is applicable to "court proceedings arising in connection with examinations commencing after the date of the enactment of this Act."  RRA of 1998, sec. 3001(c).  RRA of 1998 was enacted on July 22, 1998.  Accordingly, sec. 7491 is inapplicable to the instant case.

corporation's net operating losses.[16]  A net operating loss is defined in section 172(c) as the excess of allowable deductions, including ordinary and necessary business expenses deductible under section 162, over gross income.  Section 183, however, limits the deductions of S corporations with respect to activities that are not engaged in for profit.

Section 183(a) provides the general rule which disallows all deductions attributable to activities "not engaged in for profit".  Section 183(b)(1), however, qualifies the general rule by allowing those deductions otherwise allowable regardless of profit objective, e.g., interest and State and local taxes. Further, section 183(b)(2) allows those deductions which would be allowable if the activity were engaged in for profit, but only to

---

[16]  Sec. 1366(a) provides, in relevant part, as follows:

SEC. 1366(a).  Determination of Shareholder's Tax Liability.--

(1)  In general.--In determining the tax under this chapter of a shareholder for the shareholder's taxable year in which the taxable year of the S corporation ends * * *, there shall be taken into account the shareholder's pro rata share of the corporation's--

(A)  items of income (including tax-exempt income), loss, deduction, or credit the separate treatment of which could affect the liability for tax of any shareholder, and

(B)  nonseparately computed income or loss.

the extent that gross income attributable to the activity exceeds the deductions permitted by section 183(b)(1).

Section 183(c) defines an activity which is "not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Deductions under sections 162 or 212(1) or (2) require the "actual and honest objective of making a profit." Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Profit means economic profit independent of tax savings. Antonides v. Commissioner, 91 T.C. 686, 694 (1988), affd. 893 F.2d 656 (4th Cir. 1990). Although the expectation of making a profit need not be reasonable, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued it, with the actual and honest objective of making a profit. Id.; Dreicer v. Commissioner, supra at 645; sec. 1.183-2(a), Income Tax Regs.

Although the section 183 analysis with respect to the activities of a subchapter S corporation is applied at the corporate level, sec. 1.183-1(f), Income Tax Regs., a taxpayer's intent is attributable to his wholly owned S corporation, see Ballard v. Commissioner, T.C. Memo. 1996-68; Sousa v. Commissioner, T.C. Memo. 1989-581; Kartrude v. Commissioner, T.C. Memo. 1988-498, affd. in part, revd. in part on another ground

and remanded, 925 F.2d 1379 (11th Cir. 1991).  Accordingly, we shall examine Mr. Abbene's intent and attribute his intent to Blue Ribbon.

Whether a taxpayer has an actual and honest profit objective is decided on the basis of all surrounding circumstances. Dreicer v. Commissioner, supra at 645; sec. 1.183-2(b), Income Tax Regs.  In making our determination, we give greater weight to objective factors than to a taxpayer's statement of intent. Dreicer v. Commissioner, supra at 645; sec. 1.183-2(a), Income Tax Regs.

Section 1.183-2(b), Income Tax Regs., provides a nonexclusive list of objective factors to be considered in deciding whether an activity is engaged in for profit.  Allen v. Commissioner, 72 T.C. 28, 33 (1979).  The factors are:  (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or the taxpayer's advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.

No single factor is determinative, and all facts and circumstances, including factors not listed, should be considered.  Abramson v. Commissioner, 86 T.C. 360, 371 (1986); sec. 1.183-2(b), Income Tax Regs.  Moreover, we do not resolve the issue of profit objective by simply comparing the number of factors indicating profit objective with those indicating the lack of such an objective.  Sec. 1.183-2(b), Income Tax Regs.

If gross income derived from a horse training or breeding activity for 2 or more taxable years in a period of 7 consecutive taxable years exceeds the deductions attributable to such activity, then the activity is presumed to be an activity engaged in for profit.  Sec. 183(d).  In the instant case, as gross income from the activity did not exceed deductions from the activity during any of the years in issue, petitioners are not entitled to the presumption that Mr. Abbene's horse-related activities were engaged in for profit.  Consequently, we address the aforementioned factors to decide whether Mr. Abbene engaged in his horse-related activities through the operation of Blue Ribbon with an actual and honest profit objective during the years in issue.

1.   Manner in Which the Taxpayer Carried On the Activity

The fact that the taxpayer carries on the activity in a businesslike manner and maintains complete books and records may indicate that the activity was engaged in for profit.  Sec.

1.183-2(b)(1), Income Tax Regs. Changes in operating methods, adoption of new techniques, or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may also indicate a profit motive. Id.

Petitioners contend that Mr. Abbene operated Blue Ribbon in a businesslike manner because he: (1) Hired a certified public accountant to maintain Blue Ribbon's books and records, (2) maintained a separate bank account for Blue Ribbon's expenditures, (3) advertised Blue Ribbon's services, and (4) devoted a great deal of time to the business. Respondent argues that these facts merely reveal the trappings of a for-profit business and are outweighed by other facts indicating that Mr. Abbene operated Blue Ribbon in a nonbusinesslike manner. Respondent contends that Mr. Abbene failed to operate Blue Ribbon in a businesslike manner because he failed to prepare or maintain any type of formal business plans, budgets, operating statements, or analyses of Blue Ribbon's records to determine how to make Blue Ribbon a profitable enterprise. Respondent further contends that Mr. Abbene's failure to implement any changes to the manner in which he operated Blue Ribbon in order to improve its profitability is evidence that he lacked the requisite profit motive.

We agree with respondent. While the activity had some of the "trappings" of a business, those trappings are insufficient

under the circumstances to demonstrate that the activity was carried on for profit.  Although Mr. Abbene hired an accountant to maintain Blue Ribbon's books and records, those books and records may represent nothing more than a conscious attention to detail.  Golanty v. Commissioner, 72 T.C. 411, 430 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).  In the instant case there has been no showing that the books and records were kept for the purpose of cutting expenses, increasing profits, or evaluating the overall performance of the operation. Id.  Mr. Abbene testified that he reviewed Blue Ribbon's records, but he has failed to show that he used them to improve the operation of the enterprise.  Id.

Additionally, petitioners concede that, despite mounting losses, Blue Ribbon was operated in substantially the same manner from the time it was formed throughout all the years in issue. We believe that if profit had been the motive, Mr. Abbene would have either adopted new techniques or abandoned unprofitable methods in an effort to improve Blue Ribbon's profitability. Accordingly, we conclude that petitioners failed to establish that Mr. Abbene operated Blue Ribbon in a businesslike manner.

2.   The Expertise of the Taxpayer or the Taxpayer's Advisers

A taxpayer's expertise, research, and study of an activity, as well as his consultation with experts may be indicative of a profit motive.  Sec. 1.183-2(b)(2), Income Tax Regs.

Petitioners contend that Mr. Abbene possessed the requisite expertise to operate Blue Ribbon in a profitable manner, and that he regularly consulted others who had expertise in the activity. Respondent argues that Mr. Abbene lacked expertise with respect to the economics of running a profitable horse farm, and that petitioners failed to present any evidence that Mr. Abbene consulted outside experts in an effort to improve Blue Ribbon's profitability.

We agree with respondent. Mr. Abbene, a longstanding member of several horseman's associations, has owned horses for most of his adult life. We do not doubt his expertise and knowledge about horses. Mr. Abbene's expertise, however, did not focus on the economic aspects of the activities in which Blue Ribbon engaged. Petitioners made no showing that Mr. Abbene undertook a study of the accepted business and economic practices with respect to the activities of his horse farm or that he consulted with outside experts concerning the profitability of Blue Ribbon. Petitioners failed to show that Mr. Abbene sought or acquired the expertise that would enable him to turn his horse farm into a profitable business. See Golanty v. Commissioner, supra at 432. The failure to seek professional advice is another factor that indicates a lack of profit motive. Id.

3. The Time and Effort Expended by the Taxpayer in
   Carrying On the Activity

The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit. Sec. 1.183-2(b)(3), Income Tax Regs.

Petitioners contend that Mr. Abbene devoted a considerable amount of time and effort to the operation of Blue Ribbon which is indicative of a profit motive. Respondent argues that petitioners failed to establish the amount of time that Mr. Abbene devoted to the operation of Blue Ribbon or that he employed competent and qualified persons to oversee the day-to-day operations of Blue Ribbon in his absence. See sec. 1.183-2(b)(3), Income Tax Regs. Respondent contends that Mr. Abbene's responsibilities to his employer, Pride Chemicals, would necessarily limit the amount of time that he was able to devote to Blue Ribbon's activities.

Although the record does not support a finding of the exact amount of time that Mr. Abbene spent working for Blue Ribbon, we are convinced that it was substantial. The record indicates that Mr. Abbene and Elena managed all aspects of Blue Ribbon's operations. Mr. Abbene devoted his evenings, weekends, and much

of his vacation time to operating Blue Ribbon. Therefore, despite Mr. Abbene's outside employment with Pride Chemicals, we conclude that the time and effort expended by Mr. Abbene is a factor that favors petitioners.

4. Expectation That Assets Used in the Activity May Appreciate in Value

An expectation that assets used in the activity may appreciate in value may be an indication of a profit objective. Engdahl v. Commissioner, 72 T.C. 659, 668 (1979); sec. 1.183-2(b)(4), Income Tax Regs.

Respondent argues that petitioners had no expectation of asset appreciation. Petitioners contend that they sincerely and reasonably believed that the property and the horses used in Blue Ribbon's operations would appreciate in value.

Petitioners contend that the property had nearly doubled in value since its acquisition in 1975. Although petitioners point to the value of the property, we do not consider it to be relevant to the issue of Mr. Abbene's profit objective with respect to his horse-related activities. While the term "profit" may contemplate appreciation in the value of assets, including land, used in the activity, sec. 1.183-2(b)(4), Income Tax Regs., the holding of land for appreciation will generally be considered a separate activity for purposes of ascertaining a profit motive

where there is no net income from the activity to reduce the cost of carrying the land for appreciation, see sec. 1.183-1(d)(1), Income Tax Regs.

We conclude that the property and Mr. Abbene's horse-related activities are not to be considered a single activity. During the years in issue, the operation of Blue Ribbon did not reduce the net cost of carrying the property for its appreciation in value. Sec. 1.183-1(d)(1), Income Tax Regs. Accordingly, we consider the horse-related activities, on the one hand, and the property, on the other hand, as separate activities in deciding whether a profit objective existed.

Petitioners concede that, during and after the years in issue, the horses used in Blue Ribbon's operations actually declined in value. Petitioners argue, however, that initially they believed King Lion and Magic Moment would appreciate in value as a result of winning horse shows, and that Spectacular Rhythm and Nakita would appreciate in value if successfully bred. Hindsight, petitioners argue, does not change the fact that they started out with a reasonable expectation of appreciation. Moreover, petitioners contend that the decrease in value was due to circumstances beyond their control. Specifically, petitioners

contend that King Lion and Magic Moment both suffered injury and that Nakita suffered from fertility problems.

Petitioners presented no evidence in support of Mr. Abbene's testimony that he initially expected King Lion, Magic Moment, Spectacular Rhythm, or Nakita to increase in value. By petitioners' own admission, the horses actually decreased in value during and after the years in issue. Although petitioners contend that King Lion and Magic Moment both suffered injuries and illness[17] that prevented them from being actively shown during the years in issue, they offered no evidence regarding the nature or extent of the purported injuries. Moreover, the record is devoid of any evidence of the value of the horses had they remained healthy, and we cannot ignore the fact that Blue Ribbon was never profitable even when King Lion and Magic Moment were in full health.

Petitioners contend that they expected Spectacular Rhythm and Nakita to increase in value if they were successfully bred. Petitioners, however, offered no evidence that they implemented any type of breeding plan or method for acquiring horses appropriate for breeding purposes. Although Spectacular Rhythm

---

[17] King Lion contracted pleurisy and pneumonia during 1993 when he went to Texas with the Olympic team.

successfully produced one foal, albeit one of limited value, petitioners concede that Mr. Abbene made no further attempt to breed Spectacular Rhythm. Petitioners assert that Mr. Abbene encountered difficulties breeding Nakita. Yet, aside from a vague reference to fertility problems, the record is devoid of any evidence regarding any specific attempts to breed Nakita during the years in issue. We conclude that there is no evidence in the record that justifies Mr. Abbene's claimed expectation of appreciation in the value of the horses used in Blue Ribbon's operations.

Moreover, it is necessary that the taxpayer's objective be to realize a profit on the entire operation. Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). This would require future net earnings and appreciation sufficient to recoup the losses which the taxpayer sustained in prior years. Id. Petitioners, however, failed to produce any credible evidence that Blue Ribbon had any realistic chance of recovering the excessive losses incurred since its incorporation. In fact, petitioners conceded that they do not know when or whether Blue Ribbon will ever become profitable. Accordingly, we conclude that the expectation of asset appreciation is a factor that weighs against petitioners.

5. <u>The Success of the Taxpayer in Carrying On Similar or Dissimilar Activities</u>

The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable. Sec. 1.183-2(b)(5), Income Tax Regs.

It is uncontroverted that Mr. Abbene has never realized a profit from his horse-related activities. Petitioners contend, however, that Mr. Abbene successfully engaged in a dissimilar activity as a sales representative in the chemical industry.

While the record contains no evidence, aside from Mr. Abbene's testimony that he increased his chemical sales from $1 million to $3.5 million annually during his tenure with Pride Chemicals, we believe that Mr. Abbene enjoyed some degree of success as is evidenced by his substantial income. There is, however, no evidence to suggest that Mr. Abbene's acquired business expertise was used in the operation of Blue Ribbon. Moreover, we see few, if any, similarities between selling chemicals and operating a horse farm. Accordingly, we attach minimal significance to Mr. Abbene's success as a chemical salesman.

6.   The Taxpayer's History of Income or Loss With Respect
     to the Activity

A record of substantial losses over several years may be indicative of the absence of a profit motive. Golanty v. Commissioner, 72 T.C. at 426. A series of losses during the initial or startup stage of an activity, however, may not necessarily be an indication that the activity is not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs. Moreover, if losses are sustained because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer, such losses would not be an indication that the activity was not engaged in for profit. Id. Petitioners assert that Blue Ribbon's losses were incurred during its startup stage and that the losses were due, in part, to circumstances beyond their control.

Although the presence of losses in the early years of an activity is not inconsistent with an intention to make a profit, the goal must be to realize a profit on the entire operation, Bessenyey v. Commissioner, supra at 274, a proposition that presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years, id.

Petitioners argue that Mr. Abbene expected current profits from the use of his horses by ABC because ABC promised "many, many more jobs" and that he hoped that such work would provide a springboard to additional similar work. Petitioners, however, offered no evidence to substantiate that expectation. Blue Ribbon contracted with ABC on two occasions during 1989. It is uncontroverted, however, that ABC had no further dealings with either Mr. Abbene or Blue Ribbon after the February 1989 agreement to rent King Lion. Moreover, James Balzaretti, the ABC employee responsible for procuring props needed for the production of AMC, testified that he had no recollection that ABC made any promises that it would use Blue Ribbon for further film work. In fact, he indicated that subsequent to the episode filmed during February 1989, no horses were needed for the production of AMC. Additionally, there is nothing in the record to indicate that Mr. Abbene actively sought additional film and television work after February 1989. In light of those circumstances and given the magnitude of Blue Ribbon's losses in relation to the income generated from its activities, we are unpersuaded that Blue Ribbon was likely to ever make a profit, much less recoup its past losses.

Petitioners attribute Blue Ribbon's losses to certain circumstances beyond their control. Petitioners argue that Mr. Abbene's profit expectations were undermined because ABC failed to make good on its promise to provide additional film and television work. Aside from Mr. Abbene's testimony, however, the record contains no evidence to corroborate the contention that ABC did in fact promise additional jobs. Petitioners further contend that the Local 52 strike hampered Mr. Abbene's efforts to obtain further film and television work. The Local 52 strike, however, began in November of 1990, more than a year and a half after the last agreement between Blue Ribbon and ABC. As discussed _supra_ p. 28, there is no indication that Mr. Abbene sought further film and television work after February 1989. Thus, we cannot conclude that the strike negatively affected the performance of Blue Ribbon.

Petitioners further attribute Blue Ribbon's losses to the fact that two of their prize horses suffered from injury and illness during the years in issue. We recognize that the injuries purportedly suffered by King Lion and Magic Moment could have negatively affected Blue Ribbon's operations. As discussed _supra_ p. 24, however, petitioners failed to offer any evidence concerning the nature or extent of the injuries suffered.

Moreover, petitioners made no showing that Blue Ribbon would have been profitable had the horses not suffered injury.  See, e.g., Burger v. Commissioner, 809 F.2d 355 (7th Cir. 1987), affg. T.C. Memo. 1985-523.

7.  The Amount of Occasional Profits, If Any, Which Were Earned

The amount and frequency of occasional profits earned from the activity may also indicate a profit objective.  Sec. 1.183-2(b)(7), Income Tax Regs.  It is uncontroverted that Blue Ribbon never reported a profit from its horse-related activities.  The occasional revenues Blue Ribbon generated from horse shows and the provision of riding lessons during the years in issue were de minimis compared to the expenses and depreciation incurred. Nonetheless, petitioners contend that the opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional profits are actually produced.  Id.  Additionally, petitioners contend that a small chance of making a large profit may indicate the requisite profit objective.  Sec. 1.183-2(a), Income Tax Regs. Petitioners, however, offered no evidence to indicate that Blue Ribbon stood to earn a large or substantial profit during the

years in issue.  Accordingly, we conclude that the frequency of occasional profits is a factor that favors respondent.

8.    The Financial Status of the Taxpayer

Substantial income from sources other than the activity, particularly if the losses from the activity generate substantial tax benefits, may indicate that the activity is not engaged in for profit.  Sec. 1.183-2(b)(8), Income Tax Regs.

Petitioners concede that, during the years in issue, they enjoyed a relatively high level of income from Mr. Abbene's employment with Pride Chemicals.  Petitioners assert, however, that, without a profit motive, their income could not justify or sustain the type and size of expenditures that they incurred over the years.  Respondent contends that petitioners' substantial income from their regular employment allowed them to continue operating Blue Ribbon despite the heavy losses incurred each year.

We agree with respondent.  Petitioners reported combined gross income in the amounts of $134,629, $112,136, and $110,245 for 1990, 1991, and 1992, respectively.  Clearly, there is no benefit to losing money when the resulting tax savings represent less than 100 percent of the loss.  Engdahl v. Commissioner, 72 T.C. at 670.  Petitioners' substantial income, however, enabled

them to continue to operate Blue Ribbon notwithstanding its heavy losses and to seek to have the Government subsidize a portion of its costs. See, e.g., Gircsis v. Commissioner, T.C. Memo. 1992-244; Purdey v. Commissioner, T.C. Memo. 1989-657, affd. without published opinion 922 F.2d 833 (3d Cir. 1990).

9.    Elements of Personal Pleasure or Recreation

The presence of personal motives in the carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved. Sec. 1.183-2(b)(9), Income Tax Regs.

Petitioners concede that Mr. Abbene derived pleasure from his horse-related activities but argue that his love of horses does not indicate a lack of profit motive. To the contrary, petitioners contend that Mr. Abbene's prior investment of time, love, and money formed a natural basis from which to enter into a business.

To be sure, enjoyment of one's work is not inconsistent with a profit motive. See Jackson v. Commissioner, 59 T.C. 312, 317 (1972). On the record before us, however, we are not convinced that either Blue Ribbon or Mr. Abbene engaged in the horse-related activities with an actual and honest profit objective. Accordingly, Blue Ribbon is not entitled to take deductions for

business expenses and depreciation in excess of income. Consequently, Mr. Abbene's distributive share of Blue Ribbon's operating losses is zero.

Finally, we turn our attention to the section 1231 loss claimed by Blue Ribbon on its 1991 Form 1120S and by petitioners on their 1991 joint Federal income tax return. The loss in issue arose out of the destruction of Magic Moment, Mr. Abbene's horse. Section 1231 permits deductions for losses sustained from the sale or exchange of property used in a trade or business. To be engaged in a trade or business, the taxpayer must engage in an activity with continuity and with the primary purpose of realizing income or a profit from it. Sec. 162; Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987). Because Blue Ribbon did not engage in the horse-related activities with the requisite profit motive, the horse was not property used in a trade or business. See Budin v. Commissioner, T.C. Memo. 1994-185. Accordingly, we sustain respondent's determination on this issue.

We have considered the parties' remaining arguments and conclude that the arguments are either without merit or unnecessary to reach.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.